**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF GEORGIA**
**ATLANTA DIVISION**

| | |
|---|---|
| MCGRIFF INSURANCE SERVICES, LLC,     ) | |
|        ) | |
|     Plaintiff,     ) | |
|        ) | |
| v.     ) | Civil Action File No. |
| JONATHAN SHAE HIGGINS, DAVID DEAN, AND MELISSA DEAN,     ) | |
|     Defendants.     ) | |

## COMPLAINT FOR DAMAGES

Plaintiff McGriff Insurance Services, LLC ("McGriff"), by and through its attorneys, brings this Complaint against Defendants Jonathan Shae Higgins ("Higgins"), David Dean, and Melissa Dean (collectively with David Dean, the "Deans," and with Higgins, the "Defendants"). For its causes of action, McGriff states as follows:

### INTRODUCTION

1.     This action arises out of Higgins' breach of the restrictive covenants he entered prior to commencing employment with McGriff  and of his duty of loyalty to his employer, McGriff, by, among other things, using and providing McGriff's confidential, trade secret, and proprietary information to third parties, including the Deans, and his improper solicitation of insurance business away from McGriff

during his employment with McGriff, for the benefit of Higgins' and David Dean's current employer, Starr Mathews Agency, Inc. ("Starr Mathews").

2.     Defendants have also tortiously interfered with both contractual and business relations arising out of the Defendants' efforts to facilitate blatant breaches of Higgins' legal obligations to McGriff and those of another McGriff employee, Emily Pascua ("Pascua"), to circumvent David Dean's restrictive covenants with Federated Mutual Insurance Company ("Federated"), David Dean's former employer.

## PARTIES

3.     Plaintiff McGriff Insurance Services, LLC is a North Carolina limited liability company with its principal place of business located in Raleigh, North Carolina. McGriff has two members, TIH Investor II, Inc. ("TIH Investor II") and TIH Blocker II, Inc. ("TIH Blocker II"), and both TIH Investor II and TIH Blocker II are Delaware corporations with principal places of business in Delaware. Therefore, for purposes of jurisdiction in this action McGriff is a citizen of Delaware.

4.     McGriff is a subsidiary of TIH Insurance Holdings, LLC, and offers business and personal insurance, employee benefit solutions, and risk management services to individuals and businesses across the country.

5.     Higgins is an individual and a citizen and resident of the State of Georgia. Higgins has been a licensed insurance agent or producer in Georgia since

2019, with authority to sell casualty, property, life, accident, and sickness insurance. Higgins worked for McGriff as a Producer in McGriff's Dalton location from September 12, 2022, until his resignation on December 11, 2023.

6.     David Dean is an individual and a citizen and resident of the State of Georgia. David Dean has been a licensed insurance agent or producer in Georgia since 2007, with authority to sell casualty, property, life, accident, and sickness insurance.

7.     Melissa Dean is an individual and a citizen and resident of the State of Georgia. Melissa Dean no longer has an active license to sell insurance in Georgia.

8.     Upon information and belief, David Dean and Melissa Dean are married.

## JURISDICTION AND VENUE

9.      This Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1332(a). Complete diversity of citizenship exists, and the amount in controversy is more than $75,000.

10.    Venue is proper in this district and division pursuant to 28 U.S.C. § 1391(b)(1) and § 1391(b)(2) because at least one defendant resides in this district and all defendants are residents of the State in which the district is located and this is the district in which a substantial part of the events or omissions giving rise to the

claim occurred, or a substantial part of property that is the subject of the action is situated.

STATEMENT OF FACTS

**I.      McGriff's Legitimate Business Interests**

11.      The insurance business is a highly competitive industry, and thus McGriff's success depends largely on the relationships and goodwill it has developed with its customers over time, as well as its confidential, trade secret, and proprietary information obtained about those customers as described below.

12.      McGriff enjoys long-standing and substantial relationships with its customers due to the outstanding customer service it provides, which is based upon the knowledge of such customer needs developed over the course of substantial time and at substantial expense to McGriff.

13.      McGriff has expended substantial time, money, and effort in developing its services, professional reputation, goodwill, and business networks. In doing so, McGriff has developed valuable confidential information, including without limitation, client lists and information, client and prospect contact information, carrier and other industry contacts, marketing plans and strategies, sales strategies and techniques, financial information and projections, and databases.

14.      McGriff also takes significant measures to protect its legitimate business interests and confidential business information including, but not limited

to, entering into restrictive covenant agreements that include confidentiality and non-solicitation provisions with certain employees, including Higgins and Pascua. Such measures are common and reasonable within McGriff's industry.

## II.    Higgins and David Deans' Employment at Federated

15.    Prior to becoming employed by McGriff, Higgins worked for Federated as a Producer from approximately February 2019 through early September 2022.

16.    Upon information and belief, Higgins also executed restrictive covenants in connection with his employment at Federated.

17.    Upon information and belief, Higgins and David Dean worked together at Federated.

18.    David Dean was employed by Federated as a Senior Marketing Representative from approximately July 2017 to April 2023.

19.    Upon information and belief, David Dean executed restrictive covenants in connection with his employment at Federated.

20.    Following his employment with Federated, David Dean became employed with Starr Mathews as an Account Executive.

21.    Upon information and belief, following his employment with McGriff, Higgins became employed with Starr Mathews as a Producer, Commercial Lines.

22.    Pascua was employed by McGriff beginning from April 17, 2023, until December 3, 2023, and during her employment with McGriff worked in the same

Dalton location as Higgins. Upon information and belief, following her employment with McGriff, Pascua became employed with Starr Mathews as a Marketing Specialist, Commercial Lines.

23.     Starr Mathews, located in Georgia and Tennessee, offers business and personal insurance, employee benefit solutions, and risk management services to individuals and businesses. Starr Mathews is a direct McGriff competitor.

**III.   Higgins and Pascua's Employment with McGriff**

24.     McGriff hired Higgins as a Producer on September 12, 2022.

25.     McGriff hired Pascua as an Account Executive on April 17, 2023.

26.     Higgins and Pascua worked together in the same Dalton location of McGriff during their employment.

27.     Prior to commencing his employment, Higgins entered into an Employment Agreement with McGriff on and dated September 12, 2022.

28.     One of the express purposes of McGriff's requiring Higgins to enter the Employment Agreement was "to safeguard [McGriff's] proprietary and confidential information . . . and to protect [McGriff's] investment in training, customer relationships, and other legitimate business interests . . . ." In entering the Employment Agreement, Higgins stated that he "desired to help McGriff Insurance achieve these goals . . . ."

**IV.   Higgins' Obligations to McGriff**

29.     In consideration of his employment with McGriff, Higgins executed the

Employment Agreement, which contains certain restrictive covenants. (the "Higgins

Agreement," a true and correct copy is attached as Exhibit A).

30.     McGriff required Higgins to enter the Higgins Agreement prior to

commencing his employment to protect, among other things, McGriff's legitimate

business interest in its confidential and proprietary information and business

relationships.

31.     Higgins agreed during his employment and for two years following his

termination, not to, among other things, directly or indirectly:

> Solicit, recruit, encourage, or support on Employee's own behalf or on
> behalf of any Competitive Business (as defined below), any provider of
> insurance products to McGriff Insurance with which Employee had
> material contact within the last year of Employee's employment with
> McGriff Insurance to discontinue doing or to reduce the amount of
> business with McGriff Insurance;

> Solicit, recruit, encourage, or support on Employee's own behalf or on
> behalf of any Competitive Business (as defined below), if the purpose of
> the activity is for the Competitive Business (including but not limited to
> any Competitive Business started by Employee) to solicit a McGriff
> Insurance Customer to purchase business insurance products or to provide
> to a McGriff Insurance Customer business insurance services similar to
> those sold by Employee on behalf of McGriff Insurance within the last two
> (2) years of Employee's employment at McGriff Insurance.

(Exhibit A at ¶¶ 8(a)(ii), (iii).)

32.     The Higgins Agreement defines "Competitive Business" as:

> [A]ny enterprise that is in the business of selling, trading, or servicing
> business insurance products or services that are competitive with those

offered by McGriff Insurance during the term of Employee's employment with McGriff Insurance.

(*Id.* at ¶ 8(b)(i).)

33.    The Higgins Agreement defines "McGriff Insurance Customer" as:

[A]ny company or individual customer of McGriff Insurance with whom, within the two-year period ending with the termination of Employee's employment, Employee had material contact or who was otherwise contacted or served by Employee regarding the sale, trade, or service or the attempted sale, trade, or service of business insurance products or services.

(*Id.* at ¶ 8(b)(ii).)

34.    Higgins specifically acknowledged that the non-solicitation covenant is

reasonable, fair, and necessary:

Employee acknowledges that the restrictions placed upon Employee by . . . this Agreement are reasonable given the nature of Employee's position with McGriff Insurance, the area in which McGriff Insurance markets its products and services, and the consideration provided by McGriff Insurance to Employee. Specifically, Employee acknowledges that the length of the restrictive covenants given above is reasonable and that the definitions of "McGriff Insurance Customer" and "Competitive Business" are reasonable. Employee acknowledges that these restrictions will not cause an unfair burden on Employee.

Employee acknowledges that all of the provisions of Sections 8, 9(a), and 11 of this Agreement are fair and necessary to protect the interests of McGriff Insurance and to prevent Employee from unfairly taking advantage of contacts established during employment. Accordingly, Employee agrees not to contest the validity or enforceability of such sections of this Agreement and agrees that if any court should hold any provision of such sections or this Agreement to be unenforceable, the remaining provisions will be enforceable.

(*Id.* at ¶¶ 9(b), (c).)

35.     By entering the Higgins Agreement, Higgins also agreed that during his employment and for three years following his termination he would not:

> [W]ithout prior written approval by McGriff Insurance: (i) misappropriate; (ii) use for the purpose of competing with McGriff Insurance, either directly or indirectly; (iii) disclose to any third party, either directly or indirectly; or (iv) aid anyone else in disclosing to any third party, either directly or indirectly, all or any part of any such Confidential Information.

(*Id.* at ¶ 11(a).)

36.     The Higgins Agreement provides that the definition of Confidential Information is to be broadly defined, to include all information that has or could have commercial value or other utility in the business in which McGriff Insurance is engaged . . . and to include all information of which the unauthorized disclosure could be detrimental to the interests of McGriff Insurance.

37.     The Higgins Agreement further provides that the Parties agree that Confidential Information includes, without limitation:

> (i) confidential information described in the Truist Financial Corporation Code of Ethics and the Truist Insurance Holdings Code of Conduct, as each may be amended from time to time; (ii) any confidential, proprietary McGriff information regarding a customer of McGriff, including but not limited to customer lists, contracts, information, requirements, billing histories, and marketing methods, needs, products, and/or services provided by McGriff to such customers, as well as all customer- and policy-specific information compiled by McGriff's policy management systems . . .; (iii) all confidential financial information concerning McGriff or its affiliates, including but not limited to, financial statements, balance sheets, profit and loss statements, earnings, commissions and salaries paid to employees, sales data and projections, cost analyses, and similar information; (iv) all confidential sources and methods of supply to

McGriff or its affiliates, including but not limited to contracts and similar information; (v) all confidential plans and projections for business opportunities for new or developing business of McGriff or its affiliates, including information pertaining to potential customers or prospects; and (iv) all confidential information relating to McGriff's prices, costs, research and development activities, service performance, financial data and operating results, employee lists, personnel matters, and other confidential or proprietary information, designs, patents, ideas, and trade secrets.

(*Id.* at ¶ 11(b).)

38.    The validity, performance, construction, and effect of the Higgins Agreement is governed by the laws of the State of Georgia, without regard to the provisions for choice of law thereunder.  (*Id.* at ¶ 17.)

39.    Once Higgins and Pascua established new accounts for the customers from the Deans, those accounts became McGriff accounts and subjected Higgins and Pascua to a duty to McGriff not to disclose any information related to those accounts and to maintain those accounts solely for McGriff's benefit.

## V.    Pascua's Obligations to McGriff

40.    In consideration of her employment with McGriff, Pascua executed an agreement titled Non-Solicitation Agreement, which contained certain non-solicitation covenants as well as a non-disclosure covenant that defined Confidential Information in the same way as that in the Higgins Agreement (the "Pascua Agreement").

41.    The Pascua Agreement was designed to protect, among other things, McGriff's legitimate business interest in its confidential and proprietary information and business relationships. The covenants in Pascua's Agreement were the same or substantially similar to those in the Higgins Agreement.

42.    The Pascua Agreement contains a definition of Confidential Information that is identical to that contained in the Higgins Agreement.

## VI.    Higgins' Use of His McGriff Employment to Divert Business to Starr Mathews.

43.    During his employment with McGriff, Higgins was expected to and was highly compensated for developing new business relationships and maintaining and extending existing relationships through renewed business.

44.    Throughout Higgins' employment with McGriff, Higgins received from Melissa Dean information regarding insurance customers that David Dean had previously serviced at Federated, including the customers' Federated-branded policies and loss runs.

45.    Upon information and belief, these were customers who Higgins, Pascua, and David Dean wanted to continue servicing despite any of their restrictive covenants with their then-current employers.  After receiving the information, either Higgins or Pascua would submit information to carriers and markets for quotes, bind

insurance policies for the customers, and then send the policies and other documents directly to Melissa Dean.

46.     Melissa Dean then communicated with and serviced the customers as if she had bound the insurance coverage while working for McGriff, which she did not and has not at any point in time.

47.     Indeed, Melissa Dean was never authorized to sell insurance nor was she a third-party broker with whom McGriff did business. In fact, Melissa Dean had no business relationship with McGriff.

48.     Typically, when an insured changes or wishes to change insurance brokers, the new broker or agent sends a Broker of Record ("BOR") letter to the insurance company, notifying the insurer (and the prior broker) that the new broker wishes to service the insurance policy and handle the client's business going forward.

49.     Upon information and belief, the purpose of the scheme described above was to temporarily place the accounts at McGriff, instead of Federated where David Dean was bound by restrictive covenants, and to have the subsequent BORs come from McGriff rather than Starr Mathews, which McGriff understands ultimately became Higgins, Pascua, and David Deans' new employer.

50.     Once McGriff sent the BORs to Federated, those accounts became McGriff's accounts to service.

51.    Higgins and Pascua conducted the scheme described above through the end of their employment with McGriff.

52.    During their employment with McGriff and up to the time they each resigned from McGriff, Higgins and Pascua continued working with Melissa Dean, an unauthorized unlicensed third party, on the new McGriff accounts that were BOR'd from Federated and then began moving those accounts through BOR letters to Starr Mathews by improperly providing Melissa Dean with confidential McGriff information.

53.    As early as February 2023, Higgins and Pascua were receiving referrals from David Dean, and as early as September 2023, Higgins and Pascua worked with Melissa Dean on the referred accounts and disclosed confidential information concerning those accounts to her. In many instances, Higgins or Pascua then forwarded the referrals internally to have the proposals quoted.

54.    By way of example only, the following circumstances are documented in the thousands of emails Higgins and Pascua created at McGriff:

      a.    For one customer, Melissa Dean worked and communicated with and was the main contact for insurance purposes, and sent many emails to Higgins and Pascua informing them that the customer is ready to bind. Higgins and Pascua worked on binding the policy and on September 11, 2023, backdated the policy to become effective September 1, 2023;

b.  Also on September 11, 2023 and while Higgins was employed by McGriff, Melissa Dean sent an email to Higgins concerning four customers, stating "Have there been any changes this year to these policies? I'm preparing to begin BORs so I just want to make sure we have the most up-to-date info. . . . Probably makes sense to send me the latest lists (drivers, vehicles, equipment).";

c.  For another customer, David and Melissa Dean were the contact points for a claim and provided McGriff with information related to the claim, showing that the unlawful scheme involved not only writing insurance business, but also actively managing the accounts when claims or other matters occurred. Then in September 2023, Higgins emailed Pascua asking for all policies of this customer, with Melissa Dean copied on the email;

d.  In early September 2023, Higgins received current policies and summaries of coverages for a number of entities from Melissa Dean, which upon information and belief, were prospective customers  so Higgins and Pascua could provide quotes to those prospects through McGriff;

    e.   In August 2023, Melissa Dean sent Pascua an email asking for policies and update coverage summaries for five McGriff customers, with the obvious intent of moving that business way from McGriff; and

    f.   In April 2023, Higgins sent an email to a customer stating "Our mutual friend asked that I send you this form to sign and send to clientcontactcenter@fedins.com to end your previous policies with Federated. . . . I'm working on looking into taking over the EE policy and will update you as soon as I hear back. Thank you!"

55.    Higgins and Pascua also emailed themselves McGriff's confidential client information regarding loss runs, policies, and premiums. That proprietary and trade secret information, not in the public domain, and did not belong to the Deans, Higgins, or Pascua.

56.    McGriff did not become aware of this scheme until after Higgins resigned from his employment with McGriff.

57.    The Deans essentially used Pascua and Higgins to "launder" Federated accounts through and placed with McGriff (unbeknownst to McGriff), with the purpose and effect of eventually moving those same accounts to Staff Mathews for the mutual benefit of Starr Mathews, David Deans, Higgins, and Pascua, and to McGriff's detriment.

58.    On December 3, 2023, Pascua resigned her employment with McGriff. Shortly after Pascua's resignation, she became employed with Starr Mathews.

59.    On December 11, 2023, Higgins resigned his employment with McGriff. By no later than January 26, 2024, Higgins was employed with Starr Mathews as a Producer in their Ringgold/Dalton office.

60.    Upon information and belief, David Dean is employed with Starr Mathews as an Account Executive, Commercial Lines in their Cartersville office.

## COUNT I
## BREACH OF CONTRACT
## (HIGGINS)

61.    McGriff hereby repeats, re-alleges and incorporates by reference the allegations contained in the proceeding paragraphs as if fully set forth herein.

62.    Higgins' Agreement is a valid and enforceable contract and based on sufficient consideration.

63.    The restrictions contained in Higgins' Agreement are reasonable in scope and duration and are reasonably necessary to protect the legitimate business interests identified herein.

64.    McGriff has satisfied all of its contractual obligations to Higgins, if any.

65.    Upon information and belief, Higgins has knowingly, intentionally, and materially breached the terms of the non-solicitation clause in the Higgins

Agreement by directly or indirectly soliciting McGriff Insurance Customers on behalf of a competitive business, Starr Mathews.

66. Upon information and belief, Higgins used McGriff's Confidential Information for the purpose of competing with McGriff Insurance and disclosed McGriff's Confidential Information to third parties, including David Dean and Melissa Dean, thereby knowingly, intentionally, and materially breaching the terms of the non-disclosure clause in the Higgins Agreement.

67. McGriff has been damaged by Higgins' improper and unlawful actions in breaching the Higgins Agreement.

68. As a direct and proximate result of Higgins' breaches, McGriff has suffered damages, irreparable harm, and other damage ancillary to the aforementioned breaches.

69. Accordingly, McGriff is entitled to an award of damages incurred as a result of Higgins' material breaches of his contractual obligations under the Higgins Agreement, in an amount to be determined at trial.

### COUNT II
### TORTIOUS INTERFERENCE WITH CONTRACT AND BUSINESS RELATIONS
### (DAVID AND MELISSA DEAN)

70. McGriff hereby repeats, re-alleges and incorporates by reference the allegations contained in the proceeding paragraphs as if fully set forth herein.

71.     The Higgins Agreement is a valid and enforceable contract. The restrictions contained in the Higgins Agreement are reasonable in scope and duration and are reasonably necessary to protect the legitimate business interests identified herein.

72.     David Dean and Melissa Dean knew, or should have known, of the Higgins Agreement.

73.     David and Melissa Dean intentionally and unjustifiably induced Higgins' breaches of the Higgins Agreement and profited from clients obtained in violation of Higgins' obligations.

74.     David and Melissa Dean intentionally and unjustifiably caused McGriff customers to take their business to Starr Mathews.

75.     As a direct and proximate result of David and Melissa Deans' tortious conduct, McGriff has been damaged in an amount to be proven at trial.

## COUNT III
## BREACH OF DUTY OF LOYALTY
## (HIGGINS)

76.     McGriff hereby repeats, re-alleges and incorporates by reference the allegations contained in the proceeding paragraphs as if fully set forth herein.

77.     By virtue of his position with McGriff, Higgins owed fiduciary duties and duties of loyalty to McGriff. Those duties required Higgins to refrain from acting contrary to McGriff's business interests while employed by McGriff.

78.     The conduct of Higgins prior to the termination of his employment with McGriff constitutes a breach of his fiduciary duty and duty of loyalty owed to McGriff.

79.     Higgins' breach of his fiduciary duty and duty of loyalty was intentional, willful, wanton, and in reckless disregard for the rights of McGriff.

80.     Higgins' breach of his fiduciary duty and duty of loyalty has caused McGriff to suffer damages in an amount not yet determined. McGriff is entitled to recover from Higgins the full amount of these damages once they are determined.

81.     Higgins is not entitled to the salary and other compensation he was paid by McGriff during the period when he violated his fiduciary duty and duty of loyalty to McGriff, and must disgorge and return to McGriff all payments made to him by McGriff during the period of disloyalty.

82.     Higgins breach of his fiduciary duty and duty of loyalty was in willful, wanton, malicious and reckless disregard of those duties such that punitive damages and attorney's fees should be imposed on Higgins and awarded to McGriff in an amount to be shown at trial.

## COUNT IV
## AIDING AND ABETTING BREACH OF DUTY OF LOYALTY

### (DAVID DEAN AND MELISSA DEAN)

83.    McGriff hereby repeats, re-alleges and incorporates by reference the allegations contained in the proceeding paragraphs as if fully set forth herein.

84.    The Deans had actual knowledge of the fiduciary duties and duties of loyalty that Higgins owed to McGriff, because they were aware of Higgins' employment and position with McGriff.

85.    The Deans had actual knowledge of Higgins' breaches of his fiduciary duty and duty of loyalty to McGriff, and knowingly and willfully aided and abetted Higgins by providing substantial assistance or encouragement in breaching his fiduciary duty and duty of loyalty to McGriff, thereby enabling the breaches and resulting harm to occur.

## COUNT V
## CIVIL CONSPIRACY

### (ALL DEFENDANTS)

86.    McGriff hereby repeats, re-alleges and incorporates by reference the allegations contained in the proceeding paragraphs as if fully set forth herein.

87.    Defendants have expressly agreed, with a common design and purpose, to engage in unlawful and harmful acts towards McGriff and have, in fact, engaged in such unlawful and harmful acts as described in this Complaint.

88.     Defendants have tacitly agreed, with a common design and purpose, to engage in unlawful and harmful acts towards McGriff and have, in fact, engaged in such unlawful and harmful acts as described in this Complaint.

89.     McGriff has been damaged as a direct and proximate cause of Defendants' unlawful conduct.

90.     Defendants' unlawful conduct was willful and malicious, thus entitling McGriff to an award of punitive or exemplary damages.

91.     As co-conspirators, Defendants are jointly and severally liable for the unlawful acts taken by their co-conspirators in furtherance of the conspiracy.

### COUNT VI
### ATTORNEYS' FEES

92.     McGriff hereby repeats, re-alleges and incorporates by reference the allegations contained in the proceeding paragraphs as if fully set forth herein.

93.     Through their misconduct, Defendants have acted in bad faith and have been stubbornly litigious, and have caused McGriff unnecessary trouble and expense, in violation of O.C.G.A. § 13-6-11, thus entitling McGriff to recover its attorneys' fees and costs in bringing and maintaining this action from Defendants.

94.     In addition, the Higgins Agreement provides:  "In the event of any breach or threatened breach of the non-solicitation or confidentiality covenants by [Higgins], McGriff … shall be entitled to temporary, preliminary, or permanent injunctive relief, without bond, restraining such breach and, if successful, costs and

attorneys' fees relating to any such proceeding or any other legal action to enforce those sections of this Agreement." Higgins Agreement, ¶ 12.

95.     Through his misconduct, Higgins breached the Higgins Agreement as set forth above, and has caused McGriff to bring this action to vindicate its rights under the Higgins Agreement, thus entitling McGriff to recover its attorneys' fees and costs in bringing and maintaining this action from Higgins.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs respectfully request that the Court:

A.     Enter judgment against Higgins for breach of contract and breach of fiduciary duty and duty of loyalty;

B.     Enter judgment against David Dean and Melissa Dean for tortious interference and aiding and abetting Higgins' breach of duty of loyalty;

C.     Enter judgment against Defendants for civil conspiracy;

D.     Award McGriff its attorneys' fees and costs;

E.     Grant a trial by jury as to all matters properly triable to a jury;

F.     Award McGriff such damages as may be proven at trial;

G.     Award McGriff exemplary and/or punitive damages for Defendants' willful and malicious conduct; and

H.     Award McGriff such other and further relief as the Court deems just and proper.

Respectfully submitted this 1st day of July, 2024.

*/s/ David P. Thatcher*
David P. Thatcher
Georgia Bar No. 703299
david.thatcher@ogletreedeakins.com
Katherine Krouse Estroff
Georgia Bar No. 514298
katie.estroff@ogletree.com
OGLETREE, DEAKINS, NASH,
  SMOAK & STEWART, P.C.
191 Peachtree St., N.E., Suite 4800
Atlanta, Georgia 30303
Telephone: (404) 881-1300

*Attorneys for Plaintiff McGriff Insurance
Services, LLC*

# EXHIBIT A

# EMPLOYMENT AGREEMENT

THIS EMPLOYMENT AGREEMENT (this "Agreement"), dated the 12ᵗʰ day of September, 2022, is by and between JONATHAN SHEA HIGGINS, a resident of the State of Georgia, ("Employee") and MCGRIFF INSURANCE SERVICES, INC., a North Carolina corporation ("McGriff Insurance").

# R E C I T A L S

WHEREAS, McGriff Insurance desires to employ Employee, and Employee desires to be employed with McGriff Insurance, effective September 12, 2022 (the "Effective Date");

WHEREAS, McGriff Insurance desires (i) to establish the method of compensation to Employee for his services; (ii) to safeguard its proprietary and confidential information; (iii) to protect itself against competitive activities by Employee upon termination of Employee's employment with McGriff Insurance; and (iv) to protect its investment in training, customer relationships, and other legitimate business interests; and Employee desires to help McGriff Insurance achieve these goals;

WHEREAS, McGriff Insurance and Employee (collectively, "the Parties" and individually, a "Party") have determined that it is in their mutual best interest to commit the terms of their employment relationship in writing; and

WHEREAS, the Parties desire to enter into this Agreement to govern the terms of their employment relationship.

NOW, THEREFORE, for and in consideration of Employee's employment with McGriff Insurance and the compensation and benefits arising therefrom, and for the promises, mutual covenants, and terms of this Agreement, and as a condition of Employer giving Employee access to and the use of its confidential and proprietary business information, the Parties hereby agree as follows:

1.      Appointment.  McGriff Insurance designates and appoints Employee as a Business Insurance Agent under the classification standards of McGriff Insurance, to act and perform services on behalf of McGriff Insurance on an exclusive basis.  Employee accepts this designation and appointment.

2.      General Duties and Authority under the Employment Designation.

(a)      Status.  This Agreement establishes an employer/employee relationship. Employee shall conduct his duties and responsibilities in a professional manner and consistently with the policies and practices of McGriff Insurance.  Employee will not have any authority, either actual or implied, to incur any indebtedness or other obligations on behalf of McGriff Insurance in carrying out the duties and responsibilities provided for by this Agreement, except as specifically authorized by the terms of this Agreement or unless otherwise consented to in writing by authorized officials of McGriff Insurance.

(b)      Manner of Performance.  Employee will carry out the duties and responsibilities under this Agreement in a faithful, diligent, and responsible manner.  Employee will

secure, maintain, and continue in full force and effect all requisite licenses required by the insurance agency regulatory authorities of the State of Georgia in order for Employee to represent McGriff Insurance as a Business Insurance Agent. Employee will faithfully, diligently, competently, and to the best of his efforts perform the specific duties of and provide the services normally associated with the insurance agency business conducted by McGriff Insurance through its facility in Gainesville, Georgia, or as may be mutually agreed upon between the Parties. Employee's duties under this Agreement will extend to and include, without limitation, the rendering of services related to promoting the insurance products offered by McGriff Insurance within the general market area covered by its facility in Gainesville, Georgia, and all such other duties consistent with Employee's position as may be assigned to him. Employee's activities will be directed to maximizing the profit potential realizable both by McGriff Insurance and by Employee through the achievement of specified sales goals or other performance goals as may be designated by McGriff Insurance and as specifically provided for under the compensation arrangement in this Agreement.

3.    <u>Termination</u>.  Employment under this Agreement may be terminated by either Party without cause upon thirty (30) days' written notice to the other Party. If Employee shall so voluntarily terminate this Agreement, Employee shall not receive compensation or any other benefits after such termination except to the extent earned and vested prior to termination. If McGriff Insurance shall so terminate this Agreement, Employee shall only be entitled to Compensation (as set out below) for the thirty (30) days following such notice of termination. In the event McGriff Insurance terminates this Agreement For Cause (as defined below), McGriff Insurance may terminate Employee's employment at any time, without notice, and with Compensation due only to the date of termination. In no event shall Employee be entitled to any additional compensation, bonuses unpaid as of the date of termination, or own any interest in the accounts receivable, work in process, or other assets of McGriff Insurance.

(a)    "For Cause" means Employee's:

(i)    violation of any material provision of this Agreement, including without limitation: (A) failure of Employee to perform the duties and responsibilities imposed by this Agreement in a manner reasonably acceptable to McGriff Insurance; (B) failure to follow policies, instructions, or directions of McGriff Insurance, or (C) unacceptable performance of his duties; which responsibilities or performance described in (A), (B), or (C) is not remedied within thirty (30) days after Employee is informed in writing by McGriff Insurance (if such performance can be remedied);

(ii)    failure to adhere, after Employee has received notice in writing from McGriff Insurance of such failure and been given at least thirty (30) days in which to remedy such failure (if such failure can be remedied), to any of the Truist Financial Corporation Code of Ethics, the Truist Insurance Holdings Code of Conduct, or written policies and procedures of McGriff Insurance established from time to time, in a format furnished in writing to Employee, and generally made applicable to govern and control McGriff Insurance's employee relationships;

(iii)    failure to secure and maintain requisite licensure to perform Employee's duties;

(iv)     conviction of a felony that would preclude Employee from serving as an officer of McGriff Insurance, if applicable;

(v)      commission of a felony or a misdemeanor involving moral turpitude;

(vi)     violation of any law or regulation (other than traffic violations or similar offenses) which adversely affects Employee's licensed status to carry out and conduct the authorizations and duties prescribed by this Agreement; or

(vii)    misappropriation or inappropriate manipulation of the assets of McGriff Insurance or of any affiliate of McGriff Insurance.

(b)     The provisions of Sections 8 and 11 shall survive the termination of Employee's employment for any reason.

4.     <u>Compensation</u>.  As compensation for the services rendered by Employee under this Agreement, and in exchange for Employee's obligations set forth in Sections 8 and 11, McGriff Insurance shall pay to Employee the following compensation during the term of his employment with McGriff Insurance, subject to the sooner termination of Employee's employment as provided for herein.  McGriff Insurance shall deduct from all compensation paid to Employee all required federal, state, and local withholding taxes, as well as any other deductions required by applicable law or authorized by Employee in writing.

(a)     <u>Salary</u>.  From the Effective Date through September 30, 2025, Employee shall receive a total salary equal to One Hundred Thirty-Five Thousand and 00/100 Dollars ($135,000.00) per year.  Beginning October 1, 2025, Employee shall no longer be entitled to a Salary under this Section.  Compensation payable to Employee pursuant to this Section shall be paid in accordance with the customary payroll practices of McGriff Insurance in the jurisdiction in which Employee works.

(b)     <u>Commission Compensation</u>.  During the term of Employee's employment with McGriff Insurance, subject to the sooner termination of Employee's employment as provided for herein, Employee shall be compensated by commissions subject to and as set forth in <u>Schedule A</u> attached hereto and by this reference incorporated herein ("Commission Compensation").  Subject to the conditions in this Agreement, beginning October 1, 2025 and thereafter during the term of Employee's employment with McGriff Insurance, McGriff Insurance agrees to pay to Employee periodic advances ("Advances") of Employee's projected annual Commission Compensation.  The amount of Employee's Advances as of October 1, 2025 shall be mutually agreed upon by McGriff Insurance and Employee thereafter.  All such Advances shall be treated as advances of wages.

(c)     Commission Compensation shall be subject to the following conditions:

(i)      Advances against Commission Compensation will be paid in accordance with the customary payroll practices of McGriff Insurance in the jurisdiction in which Employee works.

(ii)     Within thirty (30) days following the end of each quarter during Employee's employment with McGriff Insurance, McGriff Insurance will calculate

and pay to Employee any Commission Compensation due Employee in excess of the sum of the Advances for that quarter.  If the calculation of Employee's Commission Compensation as described in <u>Schedule A</u> is less than the sum of Employee's Advances for that quarter, Employee shall reimburse McGriff Insurance within thirty (30) days after notice from McGriff Insurance to Employee for the difference between the Commission Compensation and the sum of such Advances for that quarter (less statutorily required deductions from Advances previously withheld by McGriff Insurance) or, at the option of McGriff Insurance, it may be carried over to the next quarter or year, as applicable.  Any Advances not repaid to McGriff Insurance as of the date of Employee's termination of employment may be deducted from Employee's final paycheck and/or from any Commission Compensation owed to Employee as of the termination date.  Employee will be invoiced for any additional amount of Advances not covered by deductions from the final paycheck and/or unpaid commissions, and Employee agrees to pay said amounts within thirty (30) days.

(d)     <u>Commercial New Business Performance Incentive Plan</u>.  As of the Effective Date (as defined above), in addition to the compensation herein, Employee shall participate in the Commercial New Business Performance Incentive Plan (the "Plan"), which may be amended, revised, or terminated at any time at the sole discretion of McGriff Insurance.  Any payments made pursuant to the Plan are payable in the first quarter of the following calendar year for the previous calendar year's performance.

5.     <u>Other Benefits</u>.  Employee shall be entitled to participate in the employee benefit programs of McGriff Insurance that are made available to similarly situated employees, subject to the terms and conditions of such programs as the same may be amended from time to time.  Employee acknowledges that Truist Financial Corporation and McGriff Insurance have the right to make changes to their benefits programs.  Beginning January 1, 2018, associates hired by McGriff Insurance are not pension-eligible.

(a)     <u>Vacation</u>.  Employee shall be eligible to earn four (4) days of vacation in 2022 to accrue at the rate of one (1) day per month.  Thereafter, Employee shall receive vacation benefits in accordance with the Truist Financial Corporation Vacation Policy.

6.     <u>McGriff Insurance Records</u>.  McGriff Insurance shall keep accurate and complete records as may be appropriate for the calculation of compensation to be paid to Employee provided for herein.  These records shall be available to Employee at reasonable times and upon reasonable notice for purpose of verifying the completeness and accuracy of the foregoing calculations.  Information supplied by Employee to McGriff Insurance in connection with the maintenance of such records shall be subject to audit at any time and from time to time by McGriff Insurance.

7.     <u>Reimbursement of Expenses</u>.  Employee shall be reimbursed for reasonable expenses incurred by Employee in furtherance of Employee's duties under this Agreement.  Reimbursement shall include reasonable customer entertainment, civic club and professional (CPCU and CIC Society) dues, and continuing training and education costs associated with maintaining the requisite Georgia insurance agency licensed status, all of which shall be subject to the Truist Financial Corporation Employee Related Expense Management Policy.  Notwithstanding any terms of the Truist Financial

Corporation Employee Related Expense Management Policy to the contrary, in compliance with Section 409A:

(a)     The amount of expenses eligible for reimbursement during any calendar year shall not affect the amount of expenses eligible for reimbursement in any other calendar year.

(b)     The reimbursement of an eligible expense shall be made on or before December 31 of the calendar year following the calendar year in which the expense was incurred.

(c)     The right to reimbursement shall not be subject to liquidation or exchange for another benefit.

8.     <u>Non-Solicitation; Defined Terms</u>.

(a)     <u>Non-Solicitation</u>.  Employee agrees that, unless specifically authorized by McGriff Insurance in writing, Employee will not, during Employee's employment and for a period of two (2) years following the date of termination of Employee's employment with McGriff Insurance (whatever the reason for the end of the employment relationship), directly or indirectly:

(i)     Solicit, recruit, encourage, or support any employee of McGriff Insurance who had performed work for McGriff Insurance and with whom Employee had material contact within the last year of Employee's employment with McGriff Insurance to leave the employment of McGriff Insurance;

(ii)     Solicit, contact, encourage, or support, on Employee's own behalf or on behalf of any Competitive Business (as defined below), any provider of insurance products to McGriff Insurance with which Employee had material contact within the last year of Employee's employment with McGriff Insurance to discontinue doing or to reduce the amount of business with McGriff Insurance; or

(iii)     Solicit, contact, call upon with the intent of doing business with, or divert any McGriff Insurance Customer (as defined below) on Employee's own behalf or on behalf of any Competitive Business (as defined below), if the purpose of the activity is for the Competitive Business (including but not limited to any Competitive Business started by Employee) to solicit a McGriff Insurance Customer to purchase business insurance products or to provide to a McGriff Insurance Customer business insurance services similar to those sold by Employee on behalf of McGriff Insurance within the last two (2) years of Employee's employment at McGriff Insurance.

(b)     <u>Defined Terms</u>.  The following capitalized terms shall have the following meanings:

(i)     "Competitive Business" means any enterprise that is in the business of selling, trading, or servicing business insurance products or services that are competitive with those offered by McGriff Insurance during the term of Employee's employment with McGriff Insurance.

(ii)    "McGriff Insurance Customer" means any company or individual customer of McGriff Insurance with whom, within the two-year period ending with the termination of Employee's employment, Employee had material contact or who was otherwise contacted or served by Employee regarding the sale, trade, or service or the attempted sale, trade, or service of business insurance products or services.

9.    Employee Acknowledgments.

(a)    Employee agrees that, during the term of his employment with McGriff Insurance, Employee will not engage in the sale, trade, or service or the attempted sale, trade, or service of business insurance individually or with any company or individual other than McGriff Insurance.

(b)    Employee acknowledges that the restrictions placed upon Employee by Sections 8 and 9(a) of this Agreement are reasonable given the nature of Employee's position with McGriff Insurance, the area in which McGriff Insurance markets its products and services, and the consideration provided by McGriff Insurance to Employee. Specifically, Employee acknowledges that the length of the restrictive covenants given above is reasonable and that the definitions of "McGriff Insurance Customer" and "Competitive Business" are reasonable. Employee acknowledges that these restrictions will not cause an unfair burden on Employee.

(c)    Employee acknowledges that all of the provisions of Sections 8, 9(a), and 11 of this Agreement are fair and necessary to protect the interests of McGriff Insurance and to prevent Employee from unfairly taking advantage of contacts established during employment. Accordingly, Employee agrees not to contest the validity or enforceability of such sections of this Agreement and agrees that if any court should hold any provision of such sections or this Agreement to be unenforceable, the remaining provisions will be enforceable. Further, if any provision or subsection is held to be overbroad as written, Employee agrees that a court should modify said provision or subsection in order to make it enforceable, view the above provisions and subsections as separable, and uphold those separable provisions and subsections deemed to be reasonable. Sections 8, 9(a), and 11 shall survive the termination of this Agreement.

10.    McGriff Insurance Information. Employee acknowledges and agrees that all sales files, customer records, customer lists, and reports used, prepared, or collected by Employee are the property of McGriff Insurance and agrees that, in the event of the termination of his employment with McGriff Insurance for any reason, he will return and make available to McGriff Insurance all sales files, customer records, customer lists, reports, and all other McGriff Insurance property and materials in his possession, prior to the last day of his employment.

11.    Confidentiality. For and in consideration of the terms of this Agreement, Employee agrees to the following for the protection of McGriff Insurance and its affiliates:

(a)    To the extent that any Confidential Information (as defined below) does not rise to the level of a trade secret under applicable law, then, during the term of Employee's employment with McGriff Insurance and for a period of three (3) years following the date of the voluntary or involuntary termination of Employee's employment with McGriff Insurance, for

whatever reason, Employee will not, without prior written approval by McGriff Insurance: (i) misappropriate; (ii) use for the purpose of competing with McGriff Insurance, either directly or indirectly; (iii) disclose to any third party, either directly or indirectly; or (iv) aid anyone else in disclosing to any third party, either directly or indirectly, all or any part of any such Confidential Information.

To the extent that any Confidential Information (as defined below) does rise to the level of a trade secret under applicable law, then, during the term of Employee's employment with McGriff Insurance and thereafter for as long as said Confidential Information remains a trade secret under applicable law (or for the maximum duration provided under such law), Employee will act in accordance with the terms of applicable law governing trade secrets.

(b)    "Confidential Information" is intended by the Parties to be broadly defined, to include all information that has or could have commercial value or other utility in the business in which McGriff Insurance is engaged or contemplates engaging, and to include all information of which the unauthorized disclosure could be detrimental to the interests of McGriff Insurance. The Parties hereby agree that "Confidential Information" includes, without limitation: (i) confidential information described in the Truist Financial Corporation Code of Ethics and the Truist Insurance Holdings Code of Conduct, as each may be amended from time to time; (ii) any confidential, proprietary McGriff information regarding a customer of McGriff, including but not limited to customer lists, contracts, information, requirements, billing histories, and marketing methods, needs, products, and/or services provided by McGriff to such customers, as well as all customer- and policy-specific information compiled in McGriff's policy management systems (including but not limited to Sagitta, AMS 360, BenefitPoint, ImageRight, and MAP); (iii) all confidential financial information concerning McGriff or its affiliates, including but not limited to, financial statements, balance sheets, profit and loss statements, earnings, commissions and salaries paid to employees, sales data and projections, cost analyses, and similar information; (iv) all confidential sources and methods of supply to McGriff or its affiliates, including but not limited to contracts and similar information; (v) all confidential plans and projections for business opportunities for new or developing business of McGriff or its affiliates, including information pertaining to potential customers or prospects; and (iv) all confidential information relating to McGriff's prices, costs, research and development activities, service performance, financial data and operating results, employee lists, personnel matters, and other confidential or proprietary information, designs, patents, ideas, and trade secrets.

"Confidential Information" shall not, however, include any information or materials to the extent that the same (i) is now in or later enters the public domain through no fault of Employee, (ii) was known to Employee prior to the disclosure by McGriff Insurance and such knowledge can be supported by written documentation supplied by Employee, or (iii) was rightfully obtained by Employee after termination of Employee's employment from a third party in rightful possession of such information.

(c)    <u>Notice of Immunity under the Defend Trade Secrets Act</u>. Notwithstanding any other provision of this Agreement, Employee shall not be held criminally or civilly liable under any federal or state trade secret law for the disclosure of any Confidential Information (as defined above) that is made in confidence (i) to a federal, state, or local government official, either directly or indirectly, or (ii) to an attorney; which is made (a) solely for the purpose of reporting or investigating a suspected violation of law or (b) in a complaint filed under seal or other document filed under seal

in a lawsuit or other proceeding. If Employee files a lawsuit for retaliation by Employer for reporting a suspected violation of law, then Employee may disclose the Confidential Information to his attorney and use the Confidential Information in the court proceeding, if Employee (or his attorney) files any document containing the Confidential Information under seal and does not otherwise disclose the Confidential Information, except pursuant to court order.

12.     Enforcement.  In the event of any breach or threatened breach of the non-solicitation or confidentiality covenants by Employee, McGriff Insurance shall be entitled to temporary, preliminary, or permanent injunctive relief, without bond, restraining such breach, and, if successful, costs and attorneys' fees relating to any such proceeding or any other legal action to enforce those sections of this Agreement, but nothing herein shall be construed as prohibiting McGriff Insurance from pursuing other remedies available to it for such breach or threatened breach.  McGriff Insurance may disclose this Agreement at any time during or after Employee's employment with McGriff Insurance to any person or entity that employs or considers employing Employee.

13.     Employee Developments.

(a)     Employee's Prior Developments.  McGriff Insurance acknowledges that Employee may have previously created patent, copyright, and trade secret rights in and to inventions, ideas, disclosures, and improvements (whether patented or unpatented) or other works of authorship developed, made, or conceived by Employee, either alone or jointly with others, in whole or in part, prior to the Effective Date, and which relate to methods, services, apparatus, designs, products, processes, or devices manufactured, produced, designed, purchased, marketed, distributed, sold, provided, under construction, or under development by McGriff Insurance, its predecessors, any subsidiary, or any affiliate (a "Development").  Notwithstanding the foregoing, this Agreement will not be construed to apply to, and will not create any assignment of, any Developments of the Employee that Employee developed entirely on his own time without using McGriff Insurance's equipment, supplies, facilities, or trade secret information except for those inventions that relate to McGriff Insurance's business or actual or demonstrably anticipated research or development or result from any work performed by the Employee for McGriff Insurance.

(b)     Existing Developments.  Employee represents that the Developments, if any, identified on Schedule B attached hereto, comprise all the unpatented and uncopyrighted Developments that Employee has made or conceived prior to or otherwise not in connection with Employee's employment with McGriff Insurance, which Developments are excluded from this Agreement.

14.     Notices.  Any notice, demand, or communication required or permitted to be given by this Agreement or applicable law shall be made in writing and sent by either first-class mail, overnight courier, hand delivery, or facsimile; provided, however, unless waived by the recipient, if such notice is made by facsimile, such facsimile shall be followed within twenty-four (24) hours by notice in writing sent by first-class mail, overnight courier, or hand delivery.  Charges for any notice shall be prepaid and addressed as follows, or to such other address as such person to whom it is to be addressed may specify by notice to the other Party: in the case of Employee, to his place of residence as currently shown on the records of McGriff Insurance, or in the case of McGriff Insurance, to its principal office at 3201 Beechleaf Court, Suite 200, Raleigh, North Carolina 27604-0014, Attention: CEO.  Any notice shall be deemed to be delivered, given, and received for all purposes as of the date such notice

was actually delivered to the recipient or, if sent by first-class mail, five (5) days after the date on which the same was deposited in a receptacle regularly maintained by the United States Postal Service for the deposit of mail, whichever occurs first.

15.     <u>Successors and Assigns</u>.  The obligations of Employee under this Agreement shall continue after the termination of Employee's employment regardless of the reason for the termination or ending of Employee's employment with McGriff Insurance and shall be binding on Employee's heirs, executors, legal representatives, and assigns.  Such obligations shall inure to the benefit of any successors or assigns of McGriff Insurance.  Employee specifically acknowledges that, in the event of a sale of all or substantially all of the assets of McGriff Insurance or any other event or transaction resulting in a change of ownership or control of McGriff Insurance's business, the rights and obligations of the Parties hereunder shall inure to the benefit of any transferee, purchaser, or future owner of McGriff Insurance's business.  This Agreement may be assigned only by McGriff Insurance.

16.     <u>Amendment; Waiver</u>.  No change or modification of this Agreement shall be valid or binding unless in writing and signed by the Party intended to be bound.  No waiver of any provision of this Agreement shall be valid unless in writing and signed by the Party against whom the waiver is sought to be enforced.  A valid waiver of any provision of this Agreement shall be limited to the instance specified in writing and, unless otherwise expressly stated, shall not be effective as a continuing waiver or repeal of such provision.

17.     <u>Governing Law; Selection of Exclusive Venue</u>.   The validity, performance, construction, and effect of this Agreement shall be governed by the substantive laws of the State of Georgia, without regard to the provisions for choice of law thereunder.  Additionally, the Parties agree that any action arising from or relating to the enforcement of this Agreement, including any challenge to the validity or enforcement hereof, shall be brought exclusively in the state court of Hall County, Georgia or the United States District Court for the Northern District of Georgia (the "Selected Courts").  Employee hereby consents to personal jurisdiction in Georgia and hereby waives any objection to the exercise of personal jurisdiction over Employee by any of the Selected Courts.

18.     <u>Judicial Procedures</u>.  The Parties hereby expressly waive the right to trial by jury with respect to any judicial proceeding brought in connection with this Agreement except in Georgia, North Carolina, or California.

19.     <u>Severability</u>.  If any provision of this Agreement is deemed invalid or unenforceable, the validity of the other provisions of this Agreement shall not be impaired.  If any provision of this Agreement shall be deemed invalid as to its scope, then, notwithstanding such invalidity, such provision shall be valid to the fullest extent permitted by law, and the Parties agree that, if any court makes such a determination, such court shall have the power to modify the duration, scope, and/or area of such provision, to delete specific words and phrases by "blue penciling," and/or, in its reduced or blue-penciled form, to enforce such provision to the fullest extent permitted by law.

20.     <u>Entire Agreement</u>.  With respect to the terms addressed in this Agreement, this Agreement contains the entire agreement and understanding by and between McGriff Insurance and Employee.  This Agreement supersedes all prior undertakings and agreements, written or oral, as may have existed prior to this date with regard to the terms addressed in this Agreement.  By the execution of this Agreement, Employee acknowledges that any such superseded understandings and agreements

are terminated, and Employee disclaims any and all rights or interest that may have existed with respect thereto. Further, any representations, promises, agreements, or understandings, written or oral, with regard to the terms addressed in this Agreement that are not contained in this Agreement shall be of no force or effect.

21. <u>Employee Claims</u>. The existence of any claim or cause of action by Employee against McGriff Insurance shall not constitute a defense to the enforcement by McGriff Insurance of Employee's covenants, obligations, or undertakings in this Agreement.

22. <u>Construction and Interpretation</u>. All references to the masculine gender shall include the feminine or neuter gender (and vice versa as the context requires). Employee and McGriff Insurance agree that this Agreement shall be construed as drafted by both of them, as parties of equivalent bargaining power, and not for or against either of them as drafter.

23. <u>No Conflicting Obligations</u>. Employee hereby acknowledges and represents that Employee's execution of this Agreement and performance of employment-related obligations and duties for McGriff Insurance will not cause any breach, default, or violation of any employment, non-disclosure, confidentiality, non-competition, or other agreement to which Employee may be a party or otherwise bound. Employee will not use in the performance of such employment-related obligations and duties for McGriff Insurance or otherwise disclose to McGriff Insurance any trade secrets or confidential information of any person or entity (including any former employer) if and to the extent that such use or disclosure may cause a breach or violation of any obligation or duty owed to such employer, person, or entity under any agreement or applicable law.

24. <u>Set-off</u>. Employee authorizes McGriff Insurance to offset the amount of any Advances (as defined above) not repaid by Employee (or any other amount(s) or debt(s) that Employee may owe to McGriff Insurance) as against any amount of compensation other than non-qualified deferred compensation (within the meaning of Section 409A, as defined below) permitted under applicable law owed to Employee under this Agreement or otherwise. In addition, Employee authorizes McGriff Insurance to offset up to a total of Five Thousand and 00/100 Dollars ($5,000.00) of the amount of any Advances not repaid by Employee (or any other amount(s) or debt(s) that Employee may owe to McGriff Insurance) as against any amount of non-qualified deferred compensation (within the meaning of Section 409A) owed to Employee under this Agreement or otherwise; provided, however, that the reduction is made at the same time and in the same amount as the debt would otherwise have been due and collected from Employee.

25. <u>Compliance with Section 409A</u>. To the extent applicable, the Parties intend that this Agreement comply with Section 409A of the Internal Revenue Code of 1986, as amended, and all regulations, guidance, or other interpretive authority thereunder ("Section 409A"). The Parties hereby agree that this Agreement shall be construed in a manner to comply with Section 409A and that should any provision be found not in compliance with Section 409A, the Parties are hereby contractually obligated to execute any and all amendments to this Agreement deemed necessary and required by legal counsel for McGriff Insurance to achieve compliance with Section 409A. By execution and delivery of this Agreement, Employee irrevocably waives any objections he may have to the amendments required by Section 409A. The Parties also agree that in no event shall any payment required to be made pursuant to this Agreement that is considered deferred compensation within the meaning of Section 409A be made to Employee unless he has incurred a "Separation from

Service" within the meaning of Section 409A.  In the event Employee is a Specified Employee, payments shall be subject to the six-month delay.  "Specified Employee" means a "specified employee" within the meaning of Section 409A and Truist Financial Corporation's specified employee identification policy.  McGriff Insurance shall not reimburse Employee for the amount of any tax liability incurred by Employee under Section 409A.

26.     Tax Reporting and Withholding.  McGriff Insurance and any agent of McGriff Insurance shall be authorized to report income, to withhold from any payment due the amount of withholding taxes due, and to take such other action as may be necessary in the opinion of McGriff Insurance to satisfy all obligations for the payment of such taxes.  Neither McGriff Insurance nor any delegatee shall be held responsible for any taxes, penalties, interest, or other monetary amounts owed by Employee or any other person as a result of amounts subject to this Agreement.

27.     Assignment.  Employee shall not have the power or right to transfer, assign, anticipate, hypothecate, mortgage, commute, modify, or otherwise encumber, in advance, any separation compensation that may be payable hereunder, nor shall any of such payments be subject to seizure for the payment of any debts, judgments, alimony, or separate maintenance owed by Employee, nor be transferable by operation of law in the event of bankruptcy, insolvency, or otherwise.

28.     Counterparts.  This Agreement may be executed in two or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.

*[Signature Page to Follow]*

IN WITNESS WHEREOF, the Parties have executed this Agreement as of the day and year first above written.

MCGRIFF INSURANCE SERVICES, INC.

By: _____
Keith Scroggins
Chief Administrative Officer


EMPLOYEE

By: _____   9/12/22
Jonathan Shea Higgins

# SCHEDULE A

McGriff Insurance Services, Inc.
2020[1] Definition of "Commission Compensation"

"Commission Compensation" means an amount based on the following formulas:

(1)     Property and Casualty Insurance

    (A)     From the Effective Date through September 30, 2025:

        (i) ten percent (10%) of all new commercial property and casualty insurance commissions (based on a policy's initial year) and/or fees payable to McGriff Insurance and produced by Employee during the applicable year of Employee's employment with McGriff Insurance, in each case net of expenses paid to third parties or divisions of McGriff Insurance that provide non-brokerage insurance services to McGriff Insurance Customers, including but not limited to loss control and actuarial services, where Employee commits McGriff Insurance to pay said expenses on behalf of a McGriff Insurance Customer ("Pass-Through Expenses"), serviced by Employee; minus (ii) any unpaid premium receivables owed to McGriff Insurance which are over ninety (90) days past due.

    (B)     Beginning October 1, 2025 and Thereafter:

        (i) forty percent (40%) of all new commercial property and casualty insurance commissions (based on a policy's initial year) and/or fees payable to McGriff Insurance and produced by Employee during the applicable year of Employee's employment with McGriff Insurance, in each case net of Pass-Through Expenses, serviced by Employee; plus (ii) twenty-five percent (25%) of all renewal commercial property and casualty insurance commissions and/or fees payable to McGriff Insurance and produced by Employee during the applicable year of Employee's employment with McGriff Insurance, in each case net of Pass-Through Expenses; plus (iii) twenty percent (20%) of all renewal commercial property and casualty insurance commissions and/or fees payable to McGriff Insurance for any accounts or books of business transferred or assigned to Employee, in each case net of Pass-Through Expenses; minus (iv) any unpaid premium receivables owed to McGriff Insurance which are over ninety (90) days past due.

(2)     Surety:

        (i) thirty percent (30%) of all new surety commissions (each based on a policy's initial year) payable to McGriff Insurance and produced by Employee; plus (ii) thirty percent (30%) of all renewal surety commissions, payable to and received by McGriff Insurance and produced by Employee during the applicable year of the Employment Period; minus (iii) any commissions paid to the Agency on bonds with balances which are over ninety (90) days past due. New bid bonds or contract bonds for customers with unpaid

---

[1] Subject to annual revision by McGriff Insurance

balances over ninety (90) days may only be written with the consent of Employer and Employee shall be responsible for any unpaid premiums on those bonds.

(3)   <u>General Provisions</u>:

Commission Compensation does not include any contingency or other special commissions received by McGriff Insurance due to overall volume and similar such payment.

Unless approved by McGriff Insurance, Employee shall not receive Commission Compensation on accounts generating less than the minimum threshold in commissions and/or fees payable to McGriff Insurance as described in the Retail Insurance Procedures Manual.

Commission Compensation is calculated when the commissions or fees on accounts are invoiced.  In the event of termination of Employee's employment, Employee's Commission Compensation will include commissions and fees on accounts which were invoiced prior to the termination date, and Employee is only entitled to receive commissions for those installment payments which have posted as income as of the date of termination.

Notwithstanding the Commission Compensation outlined above, Employee shall only be entitled to receive Commission Compensation for those lines of business for which Employee holds a valid insurance license.

**SCHEDULE B**

PRIOR DEVELOPMENTS BY EMPLOYEE
(Please initial appropriate box)


The following is a complete list of all unpatented and uncopyrighted Developments (as defined above) relevant to the subject matter of Employee's employment with McGriff Insurance that have been made or conceived by Employee prior to or otherwise not in connection with his employment with McGriff Insurance.  Employee understands that it is necessary only to list the title and purpose of such Developments, but not details thereof.


_____ 9/12/22 No inventions or improvements.

_____  All such inventions are listed below: